**Robert J. LUNDGREN, D.C., as trustee for the heirs and next of kin of Ruth Carol Lundgren, decedent, Appellant,**

v.

**Rick FULTZ, Defendant,**

David W. Cline, individually and as a member of the Department of Psychiatry of the University of Minnesota Hospitals, Respondent.

No. C1–82–1517.

Supreme Court of Minnesota.

Sept. 7, 1984.

Warren P. Eustis and Cynthia K. Nyman, Minneapolis, for appellant.

John Richard Bland, Minneapolis, for respondent.

YETKA, Justice.

This case arises upon review of a summary judgment granted in favor of defendant, a University of Minnesota psychiatrist, on the ground that plaintiff failed to state a cause of action. The trial court held that the psychiatrist was under no legal duty to warn the public of the potential danger posed by his patient, nor was he under any duty to rehospitalize the patient upon learning the patient had stopped taking his medication. The trial court did not address plaintiff's allegation that the psychiatrist negligently recommended to the University police that they return several handguns to the patient, one of which the patient later used in the senseless murder of plaintiff's decedent. We reverse and remand for a jury trial on the ground that the unaddressed element of plaintiff's complaint states a cause of action.

Viewing the troubling facts of this case in the light most favorable to the plaintiff, they are as follows: In October of 1968, police brought Rick Fultz, a graduate student in theoretical physics at the University of Minnesota, to the University of Minnesota Hospitals. Fultz had been arrested after brandishing a revolver in a Minneapolis restaurant. The Hennepin County District Court ordered Fultz admitted to the psychiatric section of the University Hospitals. Upon admission, Fultz was extremely agitated and had delusions of omnipotence. His thought content was violent and paranoid, and he spoke of killing or being killed. Fultz, at this time, came under the care of defendant Dr. David Cline, a psychiatrist with the Department of Psychiatry at the University.

It seems clear that, during this first hospitalization, Rick Fultz was a seriously disturbed individual. Fultz talked repeatedly of killing people. At one point, he vented his hostility by striking a doctor with a pool cue. The patient later brought the pool cue to a test session, stating that it took the place of a gun. Fultz told one doctor that his guns meant more to him than his penis, and Dr. Cline thought his "defensive pattern of interest" characteristic of introspective males who have great concern about their masculinity.

Dr. Cline diagnosed Fultz as a paranoid schizophrenic. Fultz was discharged from the hospital about January of 1969, after exhibiting an apparent remission in delusional thinking. The discharge statement noted, however, that the patient continued to exhibit considerable inner tension and required follow-up care.

Sometime in late 1969 or early 1970, Fultz purchased at least five handguns. He was voluntarily re-admitted to the hospital on April 20, 1970, after he was observed brandishing a pistol at a campus demonstration. At this point, he was very nervous and afraid of hurting people with his hands. The next day, Fultz escaped and went to the apartment he shared with his wife Emily. He was very angry and demanded all five of his handguns. He

armed himself to prepare for an imagined FBI assault and stated that he would fight to the death to avoid again taking thorazine.

At the request of Emily Fultz, Dr. Cline spoke with Rick on the telephone and convinced him to return to the hospital. Fultz continued to talk of hurting people during this third period of hospitalization, and clinical tests suggested that he was likely to respond to stress with irritable outbursts of anger. During the same period, Dr. Cline spoke with the University police, who suggested to Cline that his patient's weapons be confiscated. Dr. Cline and Emily Fultz agreed, and she brought the guns to the police for safekeeping. The hospital released Fultz in June of 1970, but he continued to see Dr. Cline approximately once a week.

After his release, Fultz sought return of his guns from the University police. On July 29, 1970, Fultz contacted Dr. Cline and said that the police wanted a letter from Cline before they would return his handguns to him. Captain House of the University Police Department protested to Cline that Fultz should not have guns. Captain House also refused to turn them over unless he received assurances from Dr. Cline that Fultz was "cured."

On July 29, 1970, Dr. Cline wrote a letter to House stating that "[i]n my opinion Rick Fultz has recovered from his mental illness. I feel that he can have the firearms that have been deposited with you returned to him." The police turned the weapons over to Fultz after receiving that letter. Later, at his deposition, Dr. Cline stated that Rick Fultz was in remission from his psychosis at that time. When asked whether he complied with Fultz' request in order to signal his trust in his patient, Dr. Cline emphasized that developing trust is of "the utmost importance" in treating paranoid schizophrenics.

Dr. Cline continued to treat Fultz as an outpatient for the next 18 months. Cline thought his patient was making progress and was in remission from his mental disease. Dr. Cline last saw Rick Fultz as a patient on November 10, 1971. Following that meeting, Fultz continually missed his scheduled appointments, gave various excuses for his failure to come in, and rescheduled them. On November 24, Fultz told Dr. Cline that he had stopped taking his prescribed medication. Cline told Fultz to come in to see him, but Fultz failed to do so.

Some three weeks later, on December 16, 1971, Fultz entered a restaurant near the University and shot and killed Ruth Lundgren in an unprovoked and random attack. Fultz eventually committed suicide while serving a prison sentence for this murder.

Plaintiff sued Dr. Cline for the wrongful death of his wife, alleging that Cline had been "negligent in the care, treatment, and control of Defendant Rick Fultz, and failed to exercise reasonable prudence to protect persons whom [Cline] knew, or should have known, were in danger of physical harm from Defendant Rick Fultz." Plaintiff alleged that Cline had been negligent in at least three respects: (1) by failing to warn Fultz' family that he required hospitalization, (2) by failing to recommit Fultz to the hospital, and (3) by directing that Fultz' guns be returned to him.

■ Generally, a defendant has no duty to control the conduct of a third person to prevent that person from causing injury to another. Restatement (Second) of Torts § 315 (1965). Whether a duty exists depends on two factors: (1) whether a "special relationship" existed between the defendant and the third person and (2) the foreseeability of the harm.

■ In law, we are not our brother's keeper unless "a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct." *Id.* Implicit in the duty to control is the *ability* to control. *Id.* at § 319 comments and illustrations. Viewing the evidence in the light most favorable to the plaintiff, a reasonable juror could conclude that Dr. Cline possessed some ability to control Rick Fultz' access to handguns. The University

police told Dr. Cline that they would not return the confiscated weapons without assurances of Fultz' "recovery." Dr. Cline alone made the decision to provide such assurance. A jury could conclude that the doctor possessed the ability to keep the handguns in police custody indefinitely simply by advising against their release. True, Dr. Cline could not entirely control his patient's use of handguns. Fultz was free to borrow or buy another gun; indeed, it appears the guns Fultz had were purchased by him after his first hospitalization. However, on this record, there is a genuine issue of fact whether Cline had ability to control, to some extent, Fultz' access to weapons. Although a close question, the "ability to control" is a question for the jury.

■ Even if the ability to control another's conduct exists, there is no duty to control that person unless the harm is foreseeable. Foreseeability has been called the fundamental basis of the law of negligence. Justice Cardozo succinctly expressed the central relationship between the foreseeability of harm and the existence of a legal duty in *Palsgraf*, stating that "[t]he risk reasonably to be perceived defines the duty to be obeyed * * *." *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 344, 162 N.E. 99, 100, 59 A.L.R. 1253, 1256 (1928). *See also Christianson v. Chicago, St. P.M. & O. Ry. Co.*, 67 Minn. 94, 97, 69 N.W. 640, 641 (1896) (Mitchell, J.) ("What a man may reasonably anticipate is important, and may be decisive, in determining whether an act is negligent * * *."); W. Prosser, *Handbook of the Law of Torts* §§ 31 & 43 (4th ed. 1971).

■ It is also a close question whether the shooting was foreseeable. The question is whether it was reasonably foreseeable in July 1970 that (a) the patient would, a year and a half later, refuse his medication and have a reoccurrence of his illness and that (b) in the course of that reoccurrence, he would use his gun to shoot someone. The question before us is one of policy: Is the doctor's conduct so closely connected with the tragedy of the shooting that the law may allow a cause of action?

■ Close questions on foreseeability should be given to the jury. For example, in *Illinois Farmers Insurance Company v. Tapemark Company*, 273 N.W.2d 630 (Minn.1978), a car owner negligently left the keys to his unlocked car in the trunk and parked the vehicle in a lot where crowds of young people often gathered and loitered. Without attempting to conceal his activities, the car owner opened the trunk of the car by a trunk release button located in the glove compartment. He then got out of the car, removed his golf equipment from the trunk, tossed the car keys into the trunk, and closed the lid. The car was later stolen and involved in an accident, injuring the plaintiff. We reversed the trial court's grant of summary judgment in favor of the defendant car owner.

We held that the foreseeability of the vehicle's theft and involvement in an accident-causing injury due to the negligent placement of the keys was a question for the jury. Its resolution would depend upon the jury's view of other facts, including whether young people were loitering in the parking lot at the time defendant parked his car; if so, whether the defendant knew or should have known they were present, and whether he was aware that the parking lot had been plagued by thefts and vandalism in the recent past.

Here, Rick Fultz had twice been observed brandishing handguns in public places, and defendant Dr. Cline was fully aware of this. The psychiatrist also knew of Rick Fultz' violent thought and expression, as well as his plain fixation with guns. Fultz himself expressed fear of harming others and appeared to have fairly seethed with repressed rage and fear during each of his three hospitalizations.

Moreover, the police captain said that he considered it extremely unwise to return the handguns to Fultz. He also stated that he expressly told the psychiatrist that he would not return them unless the patient were, in his word, "cured" of his mental

disease. In response, the psychiatrist wrote a letter stating that Fultz had "recovered." From this, a jury could conclude that the psychiatrist's letter caused the police to return these guns and, thus, materially increased the danger that Fultz posed. A jury could also conclude that Fultz presented a danger to the public when armed with the handguns that figured so largely in his psychosis and that someone in Dr. Cline's position should have foreseen that harm to a member of the public might result.

In holding that this plaintiff has stated a cause of action, we recognize that, in other cases, policy considerations have made courts reluctant to extend the psychiatrist's duty to control the conduct of the patient too far. In *Cairl v. State*, 323 N.W.2d 20 (Minn.1982), for example, this court refused to impose a duty to warn potential victims of a patient's dangerous propensities unless the patient has made specific threats against identifiable persons. 323 N.W.2d at 25–26. The court was concerned that if such a duty were imposed, the resulting "cacaphony" of warnings would add greatly to the stigma of mental illness while contributing little to public protection. *Id.* In *Leverett v. State*, 61 Ohio App.2d 35, 41, 399 N.E.2d 106, 110 (1978), the Ohio Court of Appeals declined to impose a duty to re-admit a patient. The court felt that this obligation would force psychiatrists to rely, at their peril, on lay persons' opinions of the danger posed by a patient. *Id.* at 399 N.E.2d at 110.

■ The policy considerations underlying the denial of a psychiatrist's duty in those cases are not present here. This case has its own special facts, including, as it does, the use of a handgun. In this case, a jury could find that Dr. Cline assisted his patient in gaining access to deadly handguns and that the patient later used one of those guns in a random homicide. There is a limit to the protection given the discretion in a professional relationship. That limit is exceeded where a psychiatrist places the gun in a potential assassin's hand under the guise of fostering trust between patient and psychiatrist. We do not believe that the imposition of a duty in those circumstances would contribute to the stigma of mental illness or impair a psychiatrist's professional discretion.

We believe Dr. Cline's duty was a professional duty, namely, whether he used that degree of care normally possessed and used by psychiatrists in good standing under like circumstances. There are many questions left unanswered in the record before us. It may be that plaintiff will be unable to prove a case, either to the trial court or the jury, but enough of a showing has been made to escape a summary judgment motion. *See Olson v. Ratzel*, 89 Wis.2d 227, 278 N.W.2d 238 (Wis.Ct.App. 1979) (summary judgment for defendant who sold pistol to a minor who shot plaintiff premature).

Reversed and remanded for trial.

SCOTT and COYNE, JJ., took no part in the consideration or decision of this case.