ANDERSON, Justice (dissenting).
The court has significantly expanded the potential liability of schools by holding that respondent The Blake School is potentially liable to the general public for the negligence of a student who, at the suggestion of his parents and with their express written consent, drove his family's personal vehicle to a post-season weekend athletic event.
Understanding what this dispute is not about is helpful. Unlike the ordinary course of motor vehicle accident litigation, appellant JeanAnn Fenrich makes no claims in this litigation against either the driver or the owner of the car; those claims have settled. Instead, she is directing her claims at a third party not involved in the accident-the high school where the driver was attending at the time of the accident.
The threshold issue on appeal is whether the school owed a duty to protect Fenrich and her husband. The existence of a duty depends "on the relationship of the parties and the foreseeable risk involved." Erickson v. Curtis Inv. Co. , 447 N.W.2d 165, 168-69 (Minn. 1989). "Ultimately, the question is one of policy." Id. at 169. Although "[t]he existence of a legal duty to protect another person presents an issue of law" that is decided by the court, Gilbertson v. Leininger , 599 N.W.2d 127, 130 (Minn. 1999), the court in this case effectively delegates the duty determination to a jury. The injuries suffered by Fenrich and her husband are tragic, but the court's holding here is an unwise expansion of potential liability, created by an unwarranted expansion of duty. Cf. Senogles v. Carlson , 902 N.W.2d 38, 49 (Minn. 2017) (Anderson, J., dissenting) ("The court opens the door to a significant, and unwarranted, expansion of social host liability."). Because I conclude that the school has no duty as a matter of law, I respectfully dissent.
I.
The duty analysis in this case is different from the typical motor vehicle negligence case. The issue here is not whether the driver or the owner of the vehicle had a duty to the persons injured by the negligence of the driver. Rather, the issue is whether the school had a duty to protect members of the general public who were injured by the negligent driving conduct of one of its students.
"Minnesota law follows the general common law rule that a person does not owe a *208 duty of care to another-e.g., to aid, protect, or warn that person-if the harm is caused by a third party's conduct." Doe 169 v. Brandon , 845 N.W.2d 174, 177-78 (Minn. 2014). In other words, a person generally "has no duty to control the conduct of a third person to prevent that person from causing injury to another." Lundgren v. Fultz , 354 N.W.2d 25, 27 (Minn. 1984) (citing Restatement (Second) of Torts § 315 (Am. Law Inst. 1965) ). Consequently, this case implicates narrow exceptions to the general rule that a person does not have a duty to "protect others from harm caused by a third party's conduct." H.B. ex rel. Clark v. Whittemore , 552 N.W.2d 705, 707 (Minn. 1996).
A duty to protect may exist when "there is a special relationship between the parties." Bjerke v. Johnson , 742 N.W.2d 660, 665 (Minn. 2007). To conclude that a special relationship exists, we assume that the harm to be prevented must be one that the defendant is "in a position to protect against and should be expected to protect against." Erickson , 447 N.W.2d at 168. I agree with the court that there is no special relationship here that would give rise to a duty on the part of the school to protect the general public.
But, in limited circumstances, a person may also be liable for harm caused by a third party's conduct "when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." Domagala v. Rolland , 805 N.W.2d 14, 23 (Minn. 2011). More specifically, we have imposed "a duty of reasonable care to prevent foreseeable harm when the defendant's conduct creates a dangerous situation." Id. at 26 ; see, e.g. , Delgado v. Lohmar , 289 N.W.2d 479, 484 (Minn. 1979) (holding that trespassing hunters, who "engaged in an extremely dangerous activity, hunting with high-powered guns[,]" should have foreseen that "the landowner may come out and ask [them] to leave"). We have defined the defendant's "own conduct" to "mean misfeasance, which is 'active misconduct working positive injury to others.' " Doe 169 , 845 N.W.2d at 178 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 56 (5th ed. 1984) ). In contrast, nonfeasance is " 'passive inaction or a failure to take steps to protect [others] from harm.' " Id.
In this case, the court concludes that a jury reasonably could find that the school's own conduct constitutes misfeasance. But the facts the court relies upon, even when viewed in the light most favorable to Fenrich, cannot be reasonably characterized as "misconduct," active or otherwise, and cannot form the basis of Fenrich's negligence claims against the school. Doe 169 , 845 N.W.2d at 178. It is a fundamental tort principle that a negligence claim must be rooted in a "wrong" in relation to the persons injured. Palsgraf v. Long Island R.R. Co. , 248 N.Y. 339, 162 N.E. 99, 100 (1928).
In fact, the school's conduct cannot even be described as active conduct generally. Rather, the court's analysis focuses on the failure of the coaches to act-their failure to veto the family's plan to have the student drive to the meet, their failure to tell the father that he should drive to the meet, and their failure to give specific safety instructions to the student. Even though it was the student's mother who proposed that the student drive their family vehicle to the meet-specifically stating that she and the father were "very comfortable with [his] driving skills" and that he was "legal now to have passengers"-the court essentially concludes that the failure of the school to take affirmative steps to prevent the student from driving or to somehow ensure that he was driving responsibly may be treated as active misconduct.
*209 [1] Moreover, the court implicitly holds that allowing a teenager to drive with other teens in the car creates "a dangerous situation." Domagala , 805 N.W.2d at 26.
The school's conduct here is far different from the type of conduct that we have characterized as misfeasance, and therefore giving rise to potential liability in other cases. For example, in Domagala , we held that "forcefully shaking a bucket attachment" to a skid loader that was hanging vertically by one pin was misfeasance. Id. at 27-28. The school did nothing like that here. At best, the school's conduct constitutes nonfeasance, and the court's decision constitutes a major departure from our jurisprudence.
Further, the court's analysis suggests that the assistant coach, who was driving ahead of the student's vehicle, and the volunteer coach, who was a passenger in the student's vehicle, had a duty to control or influence the conduct of the student driver. According to the court, a reasonable fact-finder could conclude that "the school's own conduct was misfeasant," in part, because "the assistant coach decided that the volunteer coach would ride with [the student]," and "did not give the volunteer coach any safety instructions-such as to sit in the front seat, to pay attention (rather than be distracted by electronic devices), and to make sure that [the student] drove responsibly." But we have previously held that "a passenger has no duty to members of the public to control the operation of a motor vehicle ...." Olson v. Ische , 343 N.W.2d 284, 288 (Minn. 1984). In declining to impose a duty on the passenger in Olson , even where the driver was intoxicated, we declined to assume that a passenger "somehow shares in the management of the motor vehicle" or that the driver would be "amenable to the passenger's influence." Id. at 287-88. In this case, however, by focusing on the lack of "adult supervision in the car," the court assumes, without basis, that adult supervision could have prevented the student from becoming distracted.[2] See Lundgren , 354 N.W.2d at 27 ("Implicit in the duty to control is the ability to control."); Olson , 343 N.W.2d at 288 (citing Restatement (Second) of Torts § 315 cmt. b (Am. Law Inst. 1965) (suggesting no duty on the part of a passenger to control a driver who is inattentive or otherwise driving negligently) ). Moreover, when proposing the "caravan," the mother of the driver simply asked that he not drive to the meet "without an adult at least in rear view mirrors"-in another vehicle.
The court also relies on Verhel ex rel. Verhel v. Independent School District No. 709 , 359 N.W.2d 579 (Minn. 1984), explaining that, because the assistant coach "took active responsibility for coordinating *210 transportation" to the meet, "[t]he facts that created a duty in Verhel are strikingly similar here." Even if the school's coaches helped coordinate transportation and other logistics, there is a critical difference between Verhel and this case. Verhel involved a student who was injured by another student-not a member of the general public. In Verhel , we described the school district's duty as the duty " 'to protect its students from injury resulting from the conduct of other students under circumstances where such conduct would have been reasonably foreseen and could have been prevented by the use of ordinary care.' " Id. at 586 (emphasis added) (quoting Sheehan v. St. Peter's Catholic Sch. , 291 Minn. 1, 188 N.W.2d 868, 870 (1971) ). Our decision in Verhel was premised on the school district's duty to "supervise students engaged in extracurricular activities so as to provide for their safety and welfare with respect to foreseeable hazards associated with such extracurricular activities." Id. at 586. We reasoned: "Where a school district has assumed control and supervision of all activities of a school club operated under its auspices, parents of participants have a right to rely upon that assumption." Id. at 587 (emphasis added). As the Eighth Circuit recognized, it is "[t]he relationship between a school district and its students" that "creates the duty." Gylten v. Swalboski , 246 F.3d 1139, 1143 (8th Cir.2001).
By contrast, this case does not involve injury to another student. Rather, it involves injuries to members of the general public who had no relationship with or even a connection to the school. The circumstances here readily distinguish this case from Verhel . While we have previously held that a school has a duty to use ordinary care to protect its students from injury resulting from the conduct of other students, we have never before imposed a duty on a school to protect the general public from injury caused by a student's negligence off of school grounds.
Finally, the court's announcement of a new rule that makes misfeasance a fact question for the jury is an unsettling development in our duty jurisprudence. Although the determination of misfeasance versus nonfeasance is straightforward in this case, we have previously acknowledged "the confounding complexity of characterizing a defendant's action or inaction as misfeasance or nonfeasance." Domagala , 805 N.W.2d at 22 ; see also Brower v. N. Pac. Ry. Co. , 109 Minn. 385, 124 N.W. 10, 11 (1910) (stating that "the distinction between misfeasance and nonfeasance is sometimes fanciful"). Further, the legal issue of duty-which we have long viewed as a matter of public policy for the court, cf. Gradin v. St. Paul & D. Ry. Co. , 30 Minn. 217, 14 N.W. 881, 882 (1883) -will increasingly be decided by juries, particularly in light of the court's recent cases on foreseeability, which now make "close cases" the rule rather than the exception, see infra section II.A. In sum, the court's decision on misfeasance will create confusion and inconsistency in future litigation.
II.
The court also concludes that there is a genuine issue of material fact as to whether the injuries to Fenrich and her husband were foreseeable. "Even if the ability to control another's conduct exists, there is no duty to control that person unless the harm is foreseeable." Lundgren , 354 N.W.2d at 28. The court's decision on foreseeability misapplies traditional tort doctrines. After examining the development of the concept of duty in tort law and the history of our duty determinations in "close cases," I conclude that this case is not close.
*211 A.
Foreseeability turns not on "whether the precise nature and manner of the plaintiff's injury was foreseeable, but on whether 'the possibility of an accident was clear to the person of ordinary prudence.' " Domagala , 805 N.W.2d at 27 (quoting Connolly v. Nicollet Hotel , 254 Minn. 373, 95 N.W.2d 657, 664 (1959) ). Accidents "within the realm of any conceivable possibility" are not necessarily foreseeable. Whiteford ex rel. Whiteford v. Yamaha Motor Corp. , 582 N.W.2d 916, 918 (Minn. 1998). Instead, we "look at whether the specific danger was objectively reasonable to expect." Id. Foreseeability is "ordinarily 'properly decided by the court' " as a matter of law. Domagala , 805 N.W.2d at 27 (quoting Alholm v. Wilt , 394 N.W.2d 488, 491 n.5 (Minn. 1986) ). Nonetheless, we have said that the question of foreseeability should be decided by the jury in "close cases." Senogles , 902 N.W.2d at 43 ; accord Montemayor , 898 N.W.2d at 629 ; Doe 169 , 845 N.W.2d at 178 n.2 ; Domagala , 805 N.W.2d at 27 n.3 ; Bjerke v. Johnson , 742 N.W.2d 660, 667-68 (Minn. 2007) ; Whiteford , 582 N.W.2d at 918 ; Lundgren , 354 N.W.2d at 28.[3]
But from where does this "close cases" rule come?
Like many historic concepts in tort law, the "close cases" rule probably originates in litigation against railroads in the mid-nineteenth century. In his treatise on torts, Thomas Cooley remarked that some courts considered the duty to guard against certain injuries to be a question of fact. Thomas M. Cooley, A Treatise on the Law of Torts 669 (1879); see, e.g. , Spencer v. Milwaukee & Prairie du Chien R.R. , 17 Wis. 503, 509 (1863) (holding that it was not error for a court to charge the jury with deciding whether a railroad had a duty to protect a passenger who opened a railway car's window and extended his arm slightly out the window).
Today, we probably would categorize the issues in Spencer as examples of proximate cause or contributory negligence. But Spencer is really about whether the railroad owed a duty to passengers who used the windows of a railcar for their desired purpose, to allow passengers some reprieve from the hot and stuffy confines of the railcar. See Spencer , 17 Wis. at 509; Cooley, supra , at 699. In modern parlance, Spencer raised the question of whether it was foreseeable that passengers would put their arms out the window but also whether passengers should foresee that the railroad would not clear all obstructions within an arm's length of the railcar.
The most famous exposition of these rules is in Palsgraf v. Long Island Railroad Company , 248 N.Y. 339, 162 N.E. 99 (1928). In Palsgraf , Chief Judge Cardozo explicitly links the two concepts of duty and foreseeability:
[T]he orbit of the danger as disclosed to the eye of reasonable vigilance would be the orbit of the duty .... The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension .... The range of reasonable apprehension is at times a question for the court, and at times, if varying inferences are possible, a question for the jury.
Id. at 100-01.
Our first acknowledgement of this interaction between duty, foreseeability, and the questions to be determined by a jury *212 was in Connolly v. Nicollet Hotel , 254 Minn. 373, 95 N.W.2d 657, 664 (1959) (citing Palsgraf , 162 N.E. at 100 ). In Connolly , a pedestrian was injured while she was walking along a sidewalk adjacent to the Nicollet Hotel. Id. at 661. She heard a noise that "sounded like a small explosion" and saw something strike the sidewalk in front of her. Id. As she looked up, "a mud-like substance" struck her left eye, which resulted in the loss of sight in that eye. Id. at 661-62. The pedestrian sued the Nicollet Hotel, alleging that the object that struck her had come from the hotel. Id. at 660-62. At the time of the incident, the Nicollet Hotel was hosting an annual convention for the Junior Chamber of Commerce. Id. at 662. The hotel was aware that the guests of the convention were littering the premises with broken glasses and bottles and otherwise damaging hotel property. Id. at 665. We held that the hotel's notice of the guests' conduct gave rise to a question of fact as to whether the injury to the pedestrian was foreseeable, and that it was a question for the jury. Id. at 665.
Palsgraf and Connolly exemplify the line between a close case, where "varying inferences are possible," Palsgraf , 162 N.E. at 101, and a clear case. Connolly was a close case because the hotel was aware of guest misconduct similar to the misconduct that injured the pedestrian. See 95 N.W.2d at 665. But we left it to the jury to determine whether it was foreseeable that a guest would throw a mud-like substance from a hotel window to the sidewalk below, strike a pedestrian in the eye, and cause injury. Id. "[I]t was plainly a question for the jury to say whether under these unusual circumstances the defendants should have anticipated an accident such as happened and whether they should have taken some precautions by way of securing additional police or watchmen to supervise the conduct of their patrons." Id. at 666.
Palsgraf , on the other hand, was not a close case, and a judicial determination was made that no duty existed. See 162 N.E. at 101. The facts of that case show that while attempting to board a train, a man dropped his package carrying fireworks, thereby causing an explosion and injuring Palsgraf, who was standing on the train platform at the time. Chief Judge Cardozo noted that nothing about the package of fireworks gave notice of its explosive qualities. In his words:
If the guard had thrown [the package] down knowingly and willfully, he would not have threatened the plaintiff's safety, so far as appearances could warn him. His conduct would not have involved, even then, an unreasonable probability of invasion of her bodily security. Liability can be no greater where the act is inadvertent.
Id.
B.
With these principles in mind, I turn to the facts of this case. Here, the court concludes that this case is a "close case" because the student was only recently licensed, he was "unsupervised," and he was driving a significant distance. Further, the court cites the general inexperience of teenage drivers and the modern peril of distracted driving. I disagree. This is not a close case.
It is useful to view this dispute through the lenses of Connolly and Palsgraf . Unlike the knowledge of the hotel in Connolly , 95 N.W.2d at 665, the school here had no affirmative notice that the student was a poor or negligent driver. In other words, whereas the hotel had notice that its guests were rowdy, the school had no notice of any unreasonable risk posed by the student driver and therefore had no duty.
*213 Just like the lack of notice regarding the contents of the package in Palsgraf , 162 N.E. at 101, the circumstances here did not indicate any reasonably foreseeable danger to anyone. In fact, the student's mother had vouched for her son's driving skills.
Further, we considered the characteristics of the defendants in Connolly -hotel operators engaged in the sale of intoxicating liquor-but we did not solely rely on those characteristics. 95 N.W.2d at 664. The hotel knew that the young men attending the convention had engaged in extensive partying. Id. at 665. Moreover, we noted that it was common sense that intoxication would increase disorderly behavior. Id. But, in the end, in concluding that the negligent act was "within the range of foreseeability," we relied on evidence that the hotel had notice of the misconduct of the hotel's guests-specifically, "the indiscriminate throwing of glasses, bottles, and other objects in and about the hotel ...." Id. Unlike our decision in Connolly , the court here relies almost exclusively on a supposition, without any evidence in the record, that teenage drivers are more likely to become distracted and have a heightened risk of causing an accident. Even if we grant the court these assumptions, there is nothing else in the record to indicate that the school should have realized that it had a duty to protect the general public from the driving conduct of this student.
A hypothetical helpfully illustrates what would make this case more like Connolly and less like Palsgraf . Suppose, as was suggested at oral argument, that a school official observed that a student's behavior indicated that he or she was intoxicated before that student drove to a school event. Then, just as in Connolly , the school would have notice of misconduct that might give rise to a duty to try to prevent the student from driving. The absence of that kind of notice here demonstrates how far removed this case is from Connolly .
I recognize, as the court emphasizes, that the court's decision allows a jury to determine whether a duty exists but does not mandate this determination. But that observation obscures the significant consequences that flow from this expansion of duty. Those consequences come from the mere fact that any third-party injury derived from student driving conduct is now a "close case" against the student's school that a jury must resolve based on the specific factors identified by the court for jury consideration.
As noted at the beginning of this dissent, we deal here not with traditional motor vehicle negligence analysis. No one disputes that a driver, a high school student or otherwise, owes a duty to other drivers. But now a school must consider whether it has a duty to remote individuals based on actions taken by students in almost any context. All extracurricular, and co-curricular, activities, are now guaranteed a gimlet-eyed review by the school's lawyers. Schools have beneficial relationships with all manner of groups and individuals that support school activities, including parent-teacher organizations, athletic associations, booster clubs, and alumni. For purposes of limiting liability, do schools now need to consider whether these organizations should be disbanded or at least officially disaffiliated from the school?
My concerns are magnified by the fact-specific approach dictated by the court's analysis. In discussing the duty that might be imposed on the school, the court identifies at least nine distinct factors upon which a reasonable jury could conclude that the circumstances of this case "created an objectively reasonable expectation of danger to the public":
*214 [The student] was [1] not an adult, but was a teenager, [2] who had been licensed for less than 6 months. He was [3] driving a lengthy distance [4] with no adults-only other teenagers-in the car. [5] He could not legally drive multiple passengers who were under the age of 20. [6] [The student's] parents had asked that an adult drive ahead of [the student]. In preparation for the drive, [7] the assistant coach provided no instructions to [the student], except, shortly before the accident, to "keep it safe and keep rolling." [8] The assistant coach told the volunteer coach to ride in the car with [the student], but gave no specific instructions to the volunteer coach to monitor [the student's] driving, or to ensure that [the student] did not become distracted while driving. [9] Nor did the assistant coach tell the volunteer coach to sit in the front passenger seat, where the volunteer coach could have better supervised [the student's] driving.
Are all nine factors necessary to impose a duty on a school? Are some factors more important than others? Are there other factors that might be important to the analysis? Is the mere fact that a school allows students and parents the opportunity to publicize an event to which students might drive enough to impose a duty on the school? The court's decision leaves schools with a lack of guidance on the scope of their duty.
III.
The court's ruling that the school may owe a duty to members of the general public under the circumstances of this case-an accident that took place over 100 miles from the school when a student drove to a post-season weekend athletic event at the suggestion, and with the express written permission, of his parents-represents a major expansion of school liability with troubling policy implications. There is no apparent limiting principle if the school here faces liability simply because the coaches helped coordinate some aspects of the trip and encouraged team members to participate. Because the court believes that "[t]he possibility that teen drivers may be distracted by other teens and electronics is not in any way remote or attenuated," Minnesota schools, both private and public, now risk liability to members of the general public whenever students drive themselves to or from a school activity, even when the school has no notice of any history of negligent or reckless driving. In Verhel , we made clear that we were not holding that a school is "liable for the safety of all students while in transit to or from a school activity ...." 359 N.W.2d at 586. In this case, however, with more attenuated relationships than in Verhel, the court essentially holds that a school may be liable for the safety of members of the general public when students drive to or from a school-encouraged activity.[4]
Because there is no way to tell from the court's opinion what might be enough to trigger the imposition of a duty, the response from schools will necessarily be to ratchet back on school activities and relationships in order to limit financial exposure. While schools can require parents to sign releases of liability for the schools' students, as the school did here in connection with cross-country events during the official season, it is obviously not possible for schools to obtain releases of liability from individual members of the public.
*215 When making a duty determination, courts typically consider policy factors, such as "the burden to the defendant and community of imposing a duty to exercise care with resulting liability for breach." Domagala , 805 N.W.2d at 26. For example, in a prior case, we held that a municipality did not assume a duty to protect individual members of the public with respect to the negligent inspection of the conduct of third persons for fire code violations where the plaintiffs already had a right of recovery against other defendants, reasoning:
We are being asked to add another defendant; namely, the municipality involved. If such an expansion and change of the law is to occur, it is better that the legislature act in this field where extensive hearings can be conducted to consider the extent of the financial impact of such a basic change. It is quite apparent that we are unable to comprehend the ramifications of imposing a duty to enforce the law with reasonable care.
Cracraft v. City of St. Louis Park , 279 N.W.2d 801, 808 (Minn. 1979). But the court here dispenses with policy considerations and does not consider the ramifications of imposing an expansive duty on schools. Under the court's decision, a jury's determination on foreseeability often will be determinative.
All of this is unnecessary. The district court and the court of appeals correctly concluded that this unprecedented imposition of a duty on the school was not a close case. I agree and would affirm the court of appeals.

There is no evidence that the school's coaches ever communicated directly with the student driver before the weekend of the meet about his transportation arrangements. While acknowledging that the runners were supposed to be "responsible for arranging their own lodging and transportation to the meet," the court cites an e-mail from the assistant coach (who also was a parent of one of the students travelling to the meet) to a parent of one of the other runners, indicating that the assistant coach was "stopping by the school before practice to make sure everyone has coordinated rides and rooms for this weekend." The student driver was not at practice that day. It was the mother of the driver who suggested the driving arrangements in an e-mail to the assistant coach. She merely asked the assistant coach to "confirm that is the plan"; the assistant coach responded by stating, "That works."

As the court notes, the "adult" supervision in this case was provided by a volunteer coach who was 19 years old at the time, a "teenager," and a former student at the school.

The developments in our "close cases" jurisprudence have sparked some academic commentary. See, e.g. , Mike Steenson, Duty, Foreseeability, and Montemayor v. Sebright Products Inc., 39 Mitchell Hamline L. J. Pub. Policy & Practice 31, 44-47 (2018).

Under the court's reasoning, a school district may now face liability to persons other than students and faculty even when high school students drive themselves to and from the school itself simply because the school district coordinates student transportation and provides a student parking lot.