H.B. and S.B., Minor Children, By and Through Tracy CLARKE, Their Parent and Natural Guardian, et al., Appellants,

v.

Willard McLean WHITTEMORE, SLS Partnership, a General Partnership, Faegre & Lyons Management Resources, Inc., a Minnesota Corporation, d/b/a Faelon Properties, Respondents.

No. C0–94–2115.

Court of Appeals of Minnesota.

July 11, 1995.

Dennis Patrick Moriarty, Jaspers, Moriarty and Walburg, P.A., Shakopee, for appellants.

Bradford Colbert, Melissa Sheridan, LAMP Clinic, St. Paul, for respondent Whittemore.

Laurie A. Willard, Cosgrove, Flynn, Gaskins, & O'Connor, Minneapolis, for respondent SLS Partnership.

Tony R. Krall, Michael M. Carter, Hanson Lulic & Krall, Minneapolis, for respondent Faegre & Lyons Management Resources, Inc.

Considered and decided by HUSPENI, P.J., and NORTON and KLAPHAKE, JJ.

## OPINION

NORTON, Judge.

Appellant parents and their children challenge summary judgment on their negligence and fraud claims, arguing that respondents' failure to warn them of a dangerous resident resulted in the sexual abuse of the children. We affirm summary judgment on the fraud claim, but reverse and remand for trial on the negligence claim.

## FACTS

Appellants Tracy Clarke, David Tietze, and Pamela Tietze are parents who brought this action on behalf of their four minor children who were sexually abused by respondent Willard Whittemore. Appellants and Whittemore lived in the Eaton Mobile Home Park (the Park). Respondent SLS Partnership (SLS) owns the Park. SLS contracted with respondent Faegre & Lyons Management Resources, Inc., doing business as Faelon Properties (Faelon), to manage the Park. Faelon employed Colleen Arndt as resident manager of the Park.

SLS and Faelon issued rules and regulations to Park residents in order to preserve a "quiet and enjoyable atmosphere." The rules prohibited "abusive, offensive, [and] lascivious conduct." SLS and Faelon also set forth a grievance procedure in the Park whereby residents were required to notify the manager, here Arndt, of any violations of the rules and regulations. SLS and Faelon set out Arndt as the keeper of the peace who would enforce the rules.

In order to reside in the Park, the adult appellants went through an application and approval process, by which the resident manager checked their references and qualifications, their credit history and criminal background. The Tietze family went through this process in 1983, before SLS or Faelon owned or managed the property, but received a new set of Park rules and regulations when SLS, Faelon and Arndt took over.

Similarly, appellant Tracy Clarke and her children applied and were approved for residence in the Park in February 1991. At the time Clarke purchased the trailer on the property, she had only spoken with Arndt regarding the application procedure; she had not discussed with her the environment in the Park or any security concerns. When Clarke met with Arndt to finalize the rental agreement and residence in the Park, Clarke said Arndt told her that, "it was a quiet park. There were a lot of families. If I had any problems that I was to call her and to go through my Rules and Regulations." Clarke interpreted the Park's written rules and regulations as an expressed assurance of a safe environment. She explained:

> [A]ccording to my Rules and Regulations on the conduct, if you were unruly, noisy, you would be evicted. And since [Whittemore] hadn't been evicted I figured it was safe.

In April 1992, Whittemore moved into the Park. Like appellants, he had applied to become a resident. During the application process, Whittemore told Arndt that he had previously been convicted of criminal sexual conduct and had served time in prison. He explained that he had been accused of molesting several children at the previous trailer park in which he lived. Arndt approved Whittemore's application and allowed him to move into the Park.

Whittemore, age 74, became very popular with the children in the Park because he offered them candy, cookies, and small toys and trinkets. Unbeknownst to any of the parents, Whittemore repeatedly molested these children during their visits to his yard and home. The four minor appellants were between the ages of four and seven years old at the time of this abuse. Whittemore

warned the children not to tell anyone about what he was doing with them.

In July 1992, the four children went to Arndt's home to tell her that Whittemore had been touching them. Arndt told the children to tell their parents about the alleged abuse, but did not speak to the parents or to Whittemore personally. The children did not speak with their parents until August 22, 1992 when S.B. complained to her mother, Tracy Clarke, that she had pain in her vaginal area. She also told Clarke that the children had told Arndt of the abuse in July. In addition to telling her mother, S.B. explained to Kim Huemoeller of the Midwest Children's Resource Center and to Officer Mike Backus that the group of children had complained to Arndt a few weeks before telling their parents.

During the police investigation, Officer Backus spoke with Arndt. She told him that Whittemore had divulged his prior criminal record before being approved for residence in the Park. The police investigation led to a criminal complaint charging Whittemore with five counts of criminal sexual conduct in the second degree. Whittemore pleaded guilty and is currently incarcerated for these offenses.

Appellants brought this action in April 1993 alleging that SLS and Faelon had a duty to protect and warn appellants that another resident in the Park had a history of criminal sexual misconduct. Appellants also alleged that SLS and Faelon were negligent for failing to take remedial action once they learned of the abuse. Further, appellants alleged that Faelon made false and fraudulent representations to appellants that the mobile home park was a safe and secure environment.

Upon SLS's and Faelon's first set of motions for summary judgment, the district court granted partial judgment against appellants on the negligence claims. After the second motion hearing, the court granted partial judgment against appellants on the remaining fraud claim. Appellants then moved the district court for entry of final judgment pursuant to Minn.R.Civ.P. 54.02. The court obliged and this appeal followed.

## ISSUES

1. Did Faelon and SLS have a duty to warn and protect appellants from any danger that Whittemore presented to the Park community?

2. Do any genuine issues of material fact preclude summary judgment on the fraud claims?

## ANALYSIS

Upon review of summary judgment, this court must determine whether any genuine issues of material fact exist and whether the district court erred in its application of the law. *Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 112 (Minn.1992).

## 1. Negligence and the Duty to Warn and Protect

Appellants contend that the negligence of Faelon and SLS, in failing to warn appellants of Whittemore's criminal history and of the abuse once Arndt had actual notice of it, and in failing to protect appellants, resulted in the repeated sexual abuse of the children.

To establish a claim for negligence, appellants bore the burden of showing: a duty, a breach of that duty, a causal connection between the breach of duty and injury, and injury in fact. *Spitzak v. Hylands, Ltd.*, 500 N.W.2d 154, 156 (Minn.App.1993), *pet. for rev. denied* (Minn. July 15, 1993). Whether a legal duty exists is usually an issue for the court to determine as a matter of law. *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn.1985).

Generally, under common law, a person owes no duty to warn or protect others who may be endangered by a third party's conduct. *Cairl v. State*, 323 N.W.2d 20, 25 n. 7 (Minn.1982); *see also* Restatement (Second) of Torts § 314 (no duty to take action to aid or protect others). The courts have created an exception to this rule, however, that recognizes a duty to warn and protect when: (1) the harm is foreseeable; and (2) a "special relationship" exists between either the defendant and the party whose conduct needs to be controlled, or between the defendant and the foreseeable

victims of the third party's conduct. *Cairl,* 323 N.W.2d at 25 n. 7. A special relationship may arise when one person entrusts his or her safety to another person and that person accepts that entrustment. *Erickson v. Curtis Investment Co.,* 447 N.W.2d 165, 168 (Minn.1989).

■ The court is "cautious and reluctant" to recognize a special relationship and impose a duty in business enterprises and, consequently, has rarely recognized landlord liability for criminal acts by third parties. *Id.* at 168–69 (owner and operator of commercial parking ramp owed duty to protect customers from criminal activity); *see also Ponticas v. K.M.S., Invs.,* 331 N.W.2d 907, 911 (Minn. 1983) (landlord liable for negligently hiring resident manager with criminal history after he entered tenant's room with pass key and assaulted her). *But see Spitzak,* 500 N.W.2d at 157 (no special relationship created duty on behalf of townhome development owners to protect tenant from random criminal act by third party).

■ Here we have a rare case in which a special relationship existed in a business enterprise. We make this determination based upon three salient facts present in this case. SLS and Faelon had held out Arndt as the local authority who would enforce Park rules and evict a problem resident, if necessary. Based upon those representations, the children reported the abuse to Arndt and sought her help. In addition to that actual notice of alleged abuse, SLS, Faelon, and Arndt had prior knowledge of Whittemore's criminal history. These circumstances created the necessary entrustment to establish a special relationship once the children reported the abuse to Arndt and sought her help.[1]

From the contract with SLS and Faelon, and Arndt's comments and assurances, appellants understood that Arndt would respond to reported problems by enforcing Park rules and regulations; SLS and Faelon created an expectation of assistance among the residents. *Cf. Donaldson v. Y.W.C.A. of Duluth,* 526 N.W.2d 215, 218 (Minn.App. 1995) (special relationship giving rise to duty to assist, existed between lodging house and a known "resident in distress"), *rev. granted* (Minn. Mar. 14, 1995).

From the children's standpoint, they knew they were to seek help from Arndt and expected that she would take some action to assist them. In an interview with a police officer, S.B. said:

> We went over to Colleen's [Arndt's] house, my friend's house * * * [t]hat's the manager, manager of the park, she said, if Bill doesn't stop it he'll be kicked out of the park and we're like, yes ... because he won't have to do it anymore all the time.

The children specifically entrusted themselves into Arndt's hands, yet she only told them to tell their parents; she did nothing to report or stop this abuse. As a result, the record shows that Whittemore continued abusing the children during those three weeks between the time the children spoke to Arndt and when S.B. told her mother of the abuse.

These circumstances established a special relationship between SLS, Faelon, and appellants. This special relationship is stronger than the one the supreme court recognized between the commercial parking ramp owner and a patron in *Erickson,* 447 N.W.2d at 169–70. Given that the ramp owner in *Erickson* owed anonymous customers a certain duty of care, the special relationship certainly existed here when the children reported the abuse and entrusted their safety to the manager who had been held out as the keeper of the peace.

For similar reasons, we distinguish *N.W. v. Anderson,* 478 N.W.2d 542, 543 (Minn.App. 1991), *pet. for rev. denied* (Minn. Feb. 10, 1992). Although *N.W.* is factually very similar to this case, we see two distinctions. First, we note that the court in *N.W.* did not address the question of the special relationship, but instead found no duty to warn because the harm had not been foreseeable. *Id.* at 544. Second, unlike the children here, the facts as stated in the *N.W.* opinion do not show that the victims entrusted the owners

---

1. Although entrustment may have occurred at an earlier time, we cannot make that judgment on the facts presented in this case. Once the children reported the abuse and entrusted their safety to her, however, entrustment undoubtedly occurred.

with their safety by reporting the abuse to them in hopes of getting help.

■ The special relationship between the parties here will create a duty to warn and protect only if the abuse was foreseeable. *See Lundgren v. Fultz,* 354 N.W.2d 25, 28 (Minn.1984) (no duty to protect or control unless harm is foreseeable).

> [T]he supreme court has developed a rather rigid standard determining a duty to warn exists "only when specific threats are made against specific victims."

*N.W.,* 478 N.W.2d at 544 (quoting *Cairl,* 323 N.W.2d at 26).

■ Respondents contend that the abuse was not foreseeable because Whittemore never expressed to Arndt a specific threat against the specific children involved here. We consider that irrelevant in light of the fact that the children told Arndt about the actual abuse. Unlike in *N.W.* and *Cairl,* the person who could have intervened here had actual knowledge of the damage that had already occurred and that would certainly continue to occur unless someone interceded on behalf of the children. Thus, after the children spoke to Arndt, the harm was foreseeable.

On the facts of this case, the harm to the children was not foreseeable based solely upon SLS's and Faelon's knowledge of Whittemore's criminal history. Once the children notified Arndt, however, the harm was foreseeable and SLS and Faelon had a duty to warn and protect appellants because they were in a special relationship and SLS and Faelon could not only foresee the abuse, they had actual knowledge of it. The district court erred in granting summary judgment on the negligence claim.

### 2. Fraud

■ Appellants contend the district court erred in granting summary judgment on their fraud claim. They argue that SLS and Faelon fraudulently misrepresented the Park's safe environment and their role in maintaining that environment. We disagree.

■ "Fraud is an intentional tort and scienter is an essential element." *Florenza-*

*no v. Olson,* 387 N.W.2d 168, 173 (Minn. 1986); *see also M.H. v. Caritas Family Servs.,* 488 N.W.2d 282, 289 (Minn.1992) (listing eleven elements necessary for fraudulent misrepresentation claim). "What the misrepresenter knows or believes is the key to proof of intent." *Florenzano,* 387 N.W.2d at 173.

Appellants' claim fails because they seek to prove intent after-the-fact. Before Whittemore ever came to live in the Park, SLS, Faelon, and Arndt made statements regarding the safety and quietness of the Park and that violations of the rules of conduct may lead to breach of the rental agreement. Tietzes lived in the Park since 1983; they received new rules and regulations when SLS and Faelon took over the Park. Clarke moved into the Park in February 1991. Arndt approved Whittemore for residence in April 1992.

This chronology demonstrates that it was impossible for SLS, Faelon, and Arndt to have made knowingly false statements regarding the policies and safe environment of the Park when the "danger," Whittemore, was not yet present in their environment. Without establishing that intent at the time of the statements, appellants' fraudulent misrepresentation claim fails. Summary judgment was proper.

### DECISION

A special relationship existed here between SLS, Faelon, and appellants because the children entrusted their safety to Arndt, whom SLS and Faelon had set out as the enforcer of Park rules, and because, in addition to the report of alleged abuse, SLS and Faelon knew of Whittemore's criminal history.

After the children reported the abuse, SLS and Faelon had a duty to warn and protect appellants because they were in a special relationship and the abuse was foreseeable. The district court erred in granting summary judgment on the negligence claim. We reverse and remand for further proceedings.

The district court properly granted summary judgment on the fraudulent misrepresentation claim because appellants could not establish intent.

**Affirmed in part, reversed in part, and remanded.**