H.B. and S.B., minor children, By and Through Tracy CLARK, their parent and natural guardian, et al., Respondents,

v.

Willard McLean WHITTEMORE, Respondent,

SLS Partnership, a General Partnership, Petitioner, Appellant,

Faegre & Lyons Management Resources, Inc., a Minnesota corporation, d/b/a Faelon Properties, Petitioner, Appellant.

No. C0-94-2115.

Supreme Court of Minnesota.

Aug. 29, 1996.

Hanson Lulic & Krall, Tony Krall, Michael M. Carter, Minneapolis, for Appellant Faegre & Lyons Management Resources, Inc.

Cosgrove, Flynn & Gaskins, Laurie A. Willard, Minneapolis, for Appellant SLS Partnership.

Jaspers, Moriarty and Walburg, P.A., Dennis Patrick Moriarty, Shakopee, for Respondents H.B. and S.B., By and Through Tracy Clark.

Bradford Colbert, Melissa Sheridan, LAMP Clinic, Saint Paul, for Respondent Willard McLean Whittemore.

## OPINION

STRINGER, Justice.

In this case we are once again asked to consider whether requisite "special circumstances" exist to deviate from the general common law rule that one owes no duty to warn those endangered by the conduct of a third party. The complaint here alleged fraud and negligence claims against appellants, the owners and operators of the Eaton Mobile Home Park, arising out of incidents of sexual abuse of the respondent minor children perpetrated by another tenant in the trailer park. The district court granted appellants' motions for summary judgment on the negligence allegation, concluding that appellants did not have a duty to the minor children because they were not in a special relationship with them.[1] The court of appeals reversed, concluding that when the children told the resident manager that they were being sexually abused by another tenant, a special relationship developed that gave rise to a duty to the children. We disagree and reverse.

Throughout the time of the incidents that concern us here, SLS Partnership, a General Partnership (SLS) owned the Eaton Mobile Home Park and contracted with Faegre & Lyons Management Resources, Inc., a Minnesota corporation doing business as Faelon Properties (Faelon), to manage it. Colleen Arndt was employed by Faelon as the resident manager. The family of two of the children, N.T. and K.T., moved to Eaton in 1983 when the park was owned by a company other than SLS. When SLS subsequently purchased the park, new rental agreements were executed with the tenants and copies of the park rules were provided to the tenants. The parents considered the rules to be standard mobile park regulations. Similarly, the mother of the other two children, H.B. and S.B., received a copy of the rental agreement and rules when she moved to the park in 1991, and additionally claims to have been assured by Arndt that the park was a good neighborhood for families.

The printed form Eaton rental agreement included a provision that "[t]he park shall not be liable for any injury, loss, damage, expense or cost arising from any act, default or omission of any other Tenant of the Park or of any other person, guest or visitor." The Eaton trailer park rules and regulations, as to which the tenants agreed to conform when they signed the rental agreement, contained a number of provisions relating to conduct of park tenants and guests. Section III, labeled "Conduct," provides: "You are responsible for the conduct of your children, guests

---

1. The trial court also granted appellants' motion for summary judgment on the fraud allegation, concluding that the resident manager's statements that the park was quiet and full of families did not create a safety guarantee. The court of appeals affirmed the summary judgment on this issue, and appellants have abandoned the claim. We therefore address only negligence.

and invitees" and "Noisy, unruly, abusive, offensive, lascivious conduct is not permitted." Under the "Miscellaneous" section, the rules provide for the processing of tenant complaints: "Any complaint you have about the park or other residents must be submitted to the park in writing and signed by you."

In November 1991, after the families of the children had moved to Eaton, Arndt received an application for a rental agreement from Willard Whittemore. During the application process, Whittemore told Arndt that several years earlier he had pled guilty to a charge of criminal sexual conduct after being accused of molesting several children at the trailer park where he then lived. Arndt approved Whittemore's rental application anyway, and in April of 1992 he moved into Eaton. During the summer of 1992 the four children, all girls between the ages of four and seven years old, began spending considerable amounts of time with Whittemore at his trailer. The parents were aware that their children often helped Whittemore in his garden, collected rocks with him, that he gave them treats, and that they visited his trailer nearly every day, playing, laughing, and singing with him.

In late July 1992, the children came to park manager Arndt's home and told her, in effect, that Whittemore had been touching them in an inappropriate sexual manner. Arndt responded by telling the children to tell their parents, but they did not tell their parents right away. The abuse continued for approximately another three weeks—until August 22, 1992, when S.B. told her mother about it, and upon S.B.'s mother reporting the abuse to the police, the matter was investigated. In interviews by police officers and medical personnel, the children reported that on more than one occasion Whittemore had touched and rubbed their genital areas, both under and over their underwear. Medical reports following examination of H.B. and S.B. were consistent with what the children disclosed.[2] In Whittemore's police interview, he claimed that the children made up the story of abuse to retaliate against him because he had stopped giving them treats.[3]

■ We review the summary judgment "to determine whether there are any genuine issues of material fact and whether the trial court erred in its application of the law." *Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 112 (Minn.1992). In so doing, we view the evidence in a light most favorable to the party against whom summary judgment was granted, and any doubts of the existence of a material fact are resolved in favor of the losing party. *Id.*

■ As to the existence of a duty—an issue we generally determine as a question of law for this court to decide de novo, *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn. 1985)—we first note the general common law rule that a person does not have a duty to give aid or protection to another or to warn or protect others from harm caused by a third party's conduct. *Delgado v. Lohmar*, 289 N.W.2d 479, 483 (Minn.1979). An exception to this general rule arises where the harm is foreseeable and a special relationship exists between the actor and the person seeking protection. *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 168–69 (Minn.1989); *Delgado*, 289 N.W.2d at 483. Our first consideration then, is whether there was a special relationship between Arndt and the children that imposed a duty on Arndt to the children.

■ The circumstances bringing about a duty to another have been addressed by this court on numerous occasions. In *Erickson* we noted that the relationships upon which a duty has traditionally been imposed include those of an innkeeper and a guest, a common carrier and a passenger, and a hospital and a patient, but that the unique characteristics peculiar to a parking ramp also led to the conclusion that "[t]he operator or owner of a parking ramp facility has a duty to use reasonable care to deter criminal activity on its premises which may cause personal harm to customers." 447 N.W.2d at 168, 169–70.

2. Medical reports on the other two children are not included in the record.

3. In 1993 Whittemore pled guilty to five counts of criminal sexual conduct in connection with the abuse of the children.

These characteristics included the downtown location, the scarcity of people, the ease of access from the street, the attraction of vandals and thieves to unattended cars generally, the many levels, pillars, stairwells, and rows of parked cars—all of which may provide hiding places. *Id.* at 169. The parking ramp presented a "particular focus or unique opportunity for criminals and their criminal activities, an opportunity which to some degree is different from that presented out on the street and in the neighborhood generally." *Id.* We therefore concluded that the ramp owner had a duty to use reasonable care to deter criminal activity on its premises.

Here, the court of appeals depended on *Erickson* and cited three factors in reaching its conclusion that Arndt owed the children a duty: first, that Faelon had held Arndt out as the local authority who would enforce the rules in the park and evict problem residents; second, that the children reported the abuse to Arndt because of her perceived position of authority; and third, that Arndt had prior knowledge of Whittemore's history of criminal sexual conduct. *H.B. and S.B. v. Whittemore,* 533 N.W.2d 887, 891 (Minn.App. 1995). These circumstances, the court of appeals held, "created the necessary entrustment to establish a special relationship once the children reported the abuse to Arndt and sought her help." *Id.* The court concluded that the children entrusted themselves to Arndt because they believed that they should seek help from her and expected her to act to protect them in some way.

■ Instances where a special relationship has created a duty on the part of a defendant to protect a plaintiff typically involve some degree of dependence. *See* Restatement (Second) of Torts § 314A cmt. b (1965). Such a duty might exist on the part of one who has custody of another under circumstances where the party seeking protection is deprived of or lacks the capacity for normal opportunities of self-defense, as this court considered in *Andrade v. Ellefson,* 391 N.W.2d 836 (Minn.1986). In *Andrade,* the plaintiffs seeking protection were small children in a child care home who had little opportunity to protect themselves from their

day care provider. There we held a duty existed on the part of Anoka County to protect the uniquely vulnerable children from the abusive day care provider because of the county's licensure and inspection responsibilities. *Id.* at 842–43. On the other hand, in *Harper v. Herman,* 499 N.W.2d 472 (Minn. 1993), we considered whether there was a special relationship upon which a duty to warn could be premised when Herman, a boat owner, failed to warn Harper, his guest, that the boat was anchored in water dangerously shallow for diving. In Harper's claim for injuries sustained when he dove into the water and struck the lake bottom, we held that:

> Generally, a special relationship giving rise to a duty to warn is only found on the part of common carriers, innkeepers, possessors of land who hold it open to the public, and persons who have custody of another person under circumstances in which that other person is deprived of normal opportunities of self-protection. Under this rule, a special relationship could be found to exist between the parties only if Herman had custody of Harper under circumstances in which Harper was deprived of normal opportunities to protect himself. These elements are not present here.

*Id.* at 474 (citations and footnote omitted). And in our recent decision in *Donaldson v. Y.W.C.A. of Duluth,* 539 N.W.2d 789 (Minn. 1995), we held that even where a Y.W.C.A.'s employee had actual knowledge that one of the Y.W.C.A. lodgers was in distress, it did not have a duty to prevent her from committing suicide. Because her relationship with the Y.W.C.A. was neither of a caretaking nor a custodial nature, nor had the Y.W.C.A. accepted responsibility to protect her from harming herself, there was no duty. *Id.* at 793.

With the guidance of *Erickson, Andrade, Harper,* and *Donaldson,* we are drawn to the compelling conclusion that under the circumstances here no special relationship came into existence between Arndt and the children upon which to premise a duty. Unlike *Erickson,* here there was no acceptance by Arndt of the children's entrustment; indeed it was specifically rejected when Arndt in-

structed the children to tell their parents about Whittemore's abuse. Respondents' dependence on *Andrade* is also flawed because even though the parties seeking protection in both cases are vulnerable children, here the children were not in Arndt's custody, and unlike *Andrade*, she exercised no control over their daily welfare. Finally, as to the respondent's argument that we should premise a special relationship on Minn.Stat. § 327.20, subd. 1(1) (1994), requiring a trailer park to have a resident caretaker,[4] there is no dispute that Arndt was the caretaker, or that when the children reported Whittemore's activities to her, she was available and gave them the advice to tell their parents. The statute requires nothing more, and certainly provides no support whatsoever, as the respondent urges, that from it a special relationship should arise between Arndt and the children which would form the basis of a duty on Arndt to protect the children.

The dissent's conclusion that a special relationship existed between Arndt and the children requiring Arndt to take protective measures on their behalf is emotionally appealing, but is based on a factual as well as a legal misapprehension of the circumstances here.[5] Moreover, the dissent has inappropriately expanded and imported inapplicable statutory analysis to reach a desired result. Its first premise is that when the children reported the abuse to Arndt they were unable to protect themselves because Whittemore told them not to tell their parents, and that Arndt was in some sort of authority position at the time of the report. The rec-

ord does not support these conclusions. There is nothing to suggest that Arndt had any authority or responsibility for the children—or that she was their caretaker. An adult who does not stand in a caretaking relationship with a child should not have thrust upon her an ill-defined legal responsibility to take "some reasonable action"—as suggested by the dissent—because the child chose to report mistreatment to her. Further, the dissent's assertion that the children were unable to protect themselves is questionable at best, for it is undisputed that some three weeks later they did indeed protect themselves by doing just what Arndt told them to do—they reported the abuse to their parents. We recognize a feeling of shame and fear about telling their parents would be a natural reaction for the children, but we decline to graft an exception to the common law rule of no duty simply because the personal feelings of the victims might inhibit their taking care of themselves.

In substance, none of the bases cited by the dissent for finding a special relationship[6] even remotely falls within the parameters this court has carefully carved out as the outer boundaries for this exception to the common law rule—that of "common carriers, innkeepers, possessors of land who hold it open to the public, and persons who have custody of another person under circumstances in which that other person is deprived of normal opportunities of self-protection." *Harper v. Herman,* 499 N.W.2d 472, 474 (Minn.1993). As regrettable as it is that Arndt did not take the simple step of notify-

---

4. A responsible attendant or caretaker shall be in charge of every manufactured home park or recreational camping area at all times, who shall maintain the park or area, and its facilities and equipment in a clean, orderly and sanitary condition. In any manufactured home park containing more than 50 lots, the attendant, caretaker, or other responsible park employee, shall be readily available at all times in case of emergency.
Minn.Stat. § 327.20, subd. 1(1).

5. The dissent begins its argument with the premise that it is uncontroverted the harm was foreseeable because Arndt was told by the children that they were being abused. Our conclusion that there is no special relationship here obviates the need to address the issue of foreseeability,

but a brief comment is warranted: To accept the dissent's premise would be to take judicial notice of an unsubstantiated assumption that a child molester will always repeat the offensive conduct. Under these facts, it was at least equally foreseeable that the children would immediately tell their parents about Whittemore, especially because Arndt specifically advised them to do so.

6. The dissent would also premise a special relationship based on Minn.Stat. § 626.556, subd. 3, a "mandatory reporting" statute: that is, it requires certain individuals who have frequent or confidential contact with children—i.e., doctors, social workers, psychologists, teachers, police officers, and members of the clergy—to report knowledge of physical or sexual abuse of children. Obviously there is no such relationship here between Arndt and the children.

ing the children's parents of Whittemore's conduct, we conclude that the factual circumstances did not create a duty on her to do so.

Reversed and summary judgment reinstated.

GARDEBRING, Justice (dissenting).

I respectfully dissent from the majority's conclusion that adults, who are in a position of authority relative to children, have no obligation to act once they know the children are being sexually abused. While we may not be our brother's keeper, in a civilized society, I believe it appropriate that the law recognize that we may be our children's keeper.

The general rule, as properly noted by the majority, is that a person does not have a duty to warn or protect others of danger caused by the conduct of a third party. *Olson v. Ische*, 343 N.W.2d 284, 287–88 (Minn. 1984); *see also State v. Ulvinen*, 313 N.W.2d 425, 429 (Minn.1981); Restatement (Second) of Torts § 315.

However, this court has plainly recognized that a duty may arise where the harm is foreseeable and a special relationship exists between the actor and the person seeking protection. *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 168–69 (Minn.1989). That the harm was foreseeable is uncontroverted on these facts—the park manager was told by the children that Whittemore was sexually abusing them. Thus, we are left only with the question of whether a special relationship existed between the park manager and the children. It is upon this question that I part company with the majority, which concludes that no such relationship existed.

In order to reach its conclusion, the majority opinion reads *Erickson* to impose a greater duty of care and responsibility on the owner of a parking ramp, relative to its patrons, than upon adults to whom children report criminal sexual abuse. In my view, the majority reads the "parking ramp case" too narrowly, essentially limiting the holding of *Erickson* to its facts. While in *Erickson* we held that a special duty arose because of the unique circumstances that exist in a

parking ramp which gave rise to the risk of crime, a risk which the parking ramp operator was in a position to deter, nothing in the opinion suggests that those were the only types of special circumstances which might give rise to a duty.

I conclude, as did the court of appeals in the present case, that there are unusual circumstances, equal to those in *Erickson*, though different, that give rise to a duty on the part of the mobile home park. These special circumstances include: the reports to the park manager by the children that they were being abused; the inability of the children to protect themselves against the ongoing criminal assault; the high level of protection against child sexual abuse afforded by state public policy, and the statutory provision that requires that there be a resident caretaker in each mobile home park, with an obligation to "be readily available at all times in case of emergency." Minn.Stat. § 327.20, subd. 1(1) (1994).

Taking into account our standard for consideration of the evidence in the context of a summary judgment motion, that we view the evidence in the light most favorable to the nonmoving party, there can be no question that the park manager had direct knowledge that Whittemore was sexually abusing the children—they reported it to her themselves. That such abuse takes place in clandestine settings, often with an admonition to the children to remain silent, is well-known. Thus, with the exception of the abused and frightened children and the abuser himself, the park manager was the only person with the knowledge to protect the children.

It is this pattern of secrecy, typical of childhood sexual abuse, that is behind the requirement of state law that certain individuals with frequent contact with children are required to report to public authorities any abuse described to them by children. Minn. Stat. § 626.556, subd. 1 (1994). The policy favoring protection of children against such abuse is so strong that persons who violate the "mandatory reporting" requirement may face criminal charges.[1] Minn.Stat. § 626.556,

---

1. Contrary to the assertion of the majority, I do

not premise the existence of a duty on the "man-

subd. 6 (1994). These provisions are legislative acknowledgment that children are, as to sexual abuse, deprived of the normal opportunities to protect themselves. And this "dependence" on others for protection and assistance is precisely the type of circumstances under which we have previously said a duty may arise. *See Harper v. Herman*, 499 N.W.2d 472 (Minn.1993); *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165 (Minn.1989); *Andrade v. Ellefson*, 391 N.W.2d 836 (Minn. 1986).

Further, I believe the existence of a duty to children living in the park is reinforced by the statutory obligation on the park owner to provide a resident manager. Minn.Stat. § 327.20, subd. 1(1) (1994), provides in part that "[a] responsible attendant or caretaker shall *be in charge* of every manufactured home park" and further that the caretaker "*shall be readily available at all times in case of emergency.*" (Emphasis added.) Is there anyone who would *not* consider the ongoing criminal sexual abuse of children an emergency to be dealt with expeditiously?

Finally, I suggest, as did the *Erickson* court, that the duty created by these special circumstances is a limited one. The parking lot owner in *Erickson* was not required to be the insurer or guarantor of the safety of its premises, nor is the owner of a mobile home park. But I conclude that, consistent with our earlier cases, an adult manager of a facility in which children live, mandated by statute to be responsive to emergencies, has a duty to take some reasonable action when children report they are being sexually molested by another resident of the facility. In this case, that action would likely have taken the form of a report to public authorities or to the children's parents, or both. This is a modest mandate, consistent with our past reluctance to extend a duty of protection to business entities, but surely no more than we can expect from adults in whom children place their trust.

As Justice Simonett said, ultimately the question of whether a particular set of circumstances should give rise to a duty is one of policy. *Erickson* 447 N.W.2d at 169. Given the strong public policy against child sexual abuse, I conclude these are precisely the kind of unusual circumstances which ought to take this case outside of the general rule.

Law and policy should follow common sense, and common sense in this instance suggests to me that an adult, in a position of authority and with knowledge of ongoing sexual abuse of children, has a duty to take some action. For these reasons, I respectfully dissent.

datory reporting" statute, Minn.Stat. § 626.556, subd. 3. Rather, I cite it only as evidence that Minnesota has a strong governmental policy in favor of protecting children from ongoing child abuse, and further that the policy implicates the responsibilities of children who come in frequent contact with children.