Katherine I. LASKA, Appellant,

v.

ANOKA COUNTY, et al., Defendants,

Ginger R. Flohaug, Respondent.

No. A04–1661.

Court of Appeals of Minnesota.

May 17, 2005.

Cynthia R. Bartell, Heather H. Neubauer, Foley Mansfield, P.L.L.P., Minneapolis, MN, for appellant.

Diane B. Bratvold, Jan M. Gunderson, Rider Bennett, LLP, Minneapolis, MN, for respondent.

Considered and decided by HUDSON, Presiding Judge; SCHUMACHER, Judge; and MINGE, Judge.

## OPINION

ROBERT H. SCHUMACHER, Judge.

Appellant Katherine I. Laska's infant daughter Hannah died while napping in a home day care operated by Joyce Jeffrey and staffed, on the day of Hannah's death, by Jeffrey and her daughter, respondent Ginger R. Flohaug. On appeal from the district court's judgment dismissing her wrongful-death negligence action against Flohaug, Laska argues the court erred by concluding that Flohaug owed Hannah no duty of care. We reverse the grant of summary judgment and remand for trial on the merits.

## FACTS

In 1983, Jeffrey obtained a license from Anoka County to operate a family day care in her home in Coon Rapids. *See* Minn. Stat. § ch. 245A.03, subd. 1 (2004) (charging commissioner of Minnesota Department of Human Services with licensing of human services programs, including family day care facilities); .16, subd. 1 (authorizing commissioner of human services to delegate authority to counties and private agencies to issue day care licenses). Minn.

R. 9502.0367 (2003) establishes child/adult ratios and age-distribution restrictions for different licensing categories; at all times relevant to this appeal, Jeffrey held a class C2 license, which authorizes a single adult to care for 12 children, of whom no more than two may be infants (under 12 months) or toddlers (between 12 and 30 months); of those two, only one may be an infant.

Day-care providers may apply for a periodic variance from compliance with the child/adult ratio and age-distribution restrictions by submitting a written request to the county identifying, among other things, "the specific equivalent alternative measures which the applicant or provider will provide so the health, safety, and protection of children in care are ensured if the variance is granted." Minn. R. 9502.0335, subp. 8a(A)(4) (2003).

In 1991 and 1992, Jeffrey requested and received variances to allow her to care for extra children during the summer months. As to the "specific alternative measures" she planned to take to ensure the children's safety, Jeffrey indicated on each request that she would receive caregiving assistance from her daughter, Ginger Jeffrey (now known as Ginger Flohaug), born in 1977. On the 1992 application, Jeffrey wrote that her daughter would "be very happy to have a summer job at home." No other assistance or alternative measure was indicated on any form. In 1995, Flohaug moved to Duluth to attend college.

Laska gave birth to Hannah Laska in June 2000. In July Hannah began attending the Jeffrey day care. On August 15, Jeffrey submitted a variance request for the two-week period between August 21 and September 3, when, she wrote, she would have "[one] toddler too many"; that is, of the 12 children in her care, she would have one infant (Hannah), two toddlers (instead of the one permitted pursuant to her C2 license), and nine older children.

As she had done previously, Jeffrey referenced her daughter Flohaug—who had recently finished college and planned to move back into Jeffrey's house on August 20—as her helper during the variance period. Jeffrey and Flohaug discussed the matter before Flohaug returned home, and Flohaug told her mother she would be "around to help" with the day care. Jeffrey wrote on the variance request: "I will have good, reliable help. My daughter is a [physical education] and health teacher who loves kids." On August 14, in the course of a relicensing inspection of her home, Jeffrey informed a county social worker that "her adult daughter, Ginger Jeffrey, would be moving home the next week and would be available to help" with the children. The county granted the variance request on August 17.

On August 21, the first effective day of the variance, the conditions in the Jeffrey day care violated the variance in at least three ways: the ratio of children to adults exceeded the ratio permitted by the variance; the ages of the children present violated the age-distribution restrictions established by the variance: instead of one infant and two toddlers, as permitted by the variance, there were in fact two infants and four toddlers present; and the total number of children present—13—exceeded the total number of children Jeffrey had indicated in the variance request. Flohaug was present in the home until the late morning, when she left for a job interview; she was absent for between two and three hours.

At about noon, after Flohaug had already left, Laska dropped Hannah off at Jeffrey's home. At approximately 1:30, Jeffrey took Hannah to the spare room at the rear of the house for a nap. Jeffrey laid Hannah on her stomach on an adult bed on top of a foam-filled comforter. At approximately 2:00, Flohaug returned

home and provided general caregiving assistance to her mother. At some point in the afternoon, she helped care for a toddler who fell in the kitchen and cut her head. Between 2:00 and 2:30, Jeffrey went into the spare bedroom where Hannah was sleeping to retrieve another child who was napping in a crib in the room. Jeffrey did not notice anything unusual about Hannah.

According to the police report filed after Hannah's death, Flohaug informed the police that "sometime between [3:30 and 4:00] she had gone into the bedroom and that she had heard the baby making some type of crying noise or was just making nondescript noises in general." This statement is also reflected in the coroner's report. At her deposition taken nearly four years later, Flohaug testified she never entered the room until approximately 4:30 and denied having made the statement to the officer.

Flohaug maintains she entered the room at approximately 4:30, sat on the bed for approximately 10 minutes watching television, then turned to check on Hannah and saw that the child had "a bluish tinge to the face" and was not breathing. She called for her mother and called 911. The paramedics arrived, attempted unsuccessfully to resuscitate the child, and took her to the hospital, where she was pronounced dead. The coroner's report states the cause of death as "[p]ossible sudden infant death syndrome" and indicates that "[p]rone sleeping condition on an adult-type bed" was a "significant condition" leading to death.

In August 2003, Katherine Laska filed a wrongful-death action against Anoka County, Jeffrey, and Flohaug, alleging as to Flohaug that Flohaug's negligent care and supervision of Hannah caused the child's death. Flohaug moved for summary judgment, arguing, among other things, that she owed Hannah no legal duty of care and that she could not have foreseen the harm to Hannah. The district court granted the motion, reasoning "[n]o relationship whatsoever existed between Flohaug and ... Hannah, much less a special relationship. Furthermore, Flohaug was not present when Hannah was placed on the bed, and there is no evidence that Flohaug foresaw the risk of an infant being on an adult bed when, on her return, she did see Hannah there."

## ISSUE

Did the district court err in granting Flohaug summary judgment on the grounds that Flohaug owed no duty of care to Hannah Laska?

## ANALYSIS

Summary judgment is appropriate where the record shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03. This court reviews a district court's grant of summary judgment to determine whether there are any genuine issues of material fact and whether the lower court erred in its application of law. *H.B. ex rel. Clark v. Whittemore*, 552 N.W.2d 705, 707 (Minn.1996). On appeal, we view the evidence in the light most favorable to the party against whom summary judgment was granted—Laska—and will resolve any doubts about the existence of a material fact in Laska's favor. *Id.*

Flohaug is entitled to summary judgment if the record reflects Laska's failure to prove any of the four essential elements of the negligence claim: (1) Flohaug had a legal duty to Hannah to take some action; (2) there was a breach of that duty; (3) the breach of the duty was the proximate cause of the harm to Hannah; and (4) damage. *Lubbers v. Anderson*,

539 N.W.2d 398, 401 (Minn.1995). The district court granted Flohaug summary judgment after concluding she owed no duty of care to Hannah. The existence of a legal duty is a question of law, which this court reviews de novo. *Clark,* 552 N.W.2d at 707.

"A person generally has no duty to act for the protection of another person. The existence of a legal duty to act depends on two factors: (1) the relationship of the parties, and (2) the foreseeability of the risk involved." *Gilbertson v. Leininger,* 599 N.W.2d 127, 130 (Minn.1999) (citation omitted). A "special relationship" giving rise to a legal duty to protect another exists where one person has "custody of another person under circumstances in which that other person is deprived of normal opportunities of self-protection." *Harper v. Herman,* 499 N.W.2d 472, 474 (Minn.1993). "Typically, the plaintiff is in some respect particularly vulnerable and dependent on the defendant, who in turn holds considerable power over the plaintiff's welfare." *Donaldson v. Young Women's Christian Ass'n of Duluth,* 539 N.W.2d 789, 792 (Minn.1995); *cf. Harper,* 499 N.W.2d at 474–75 (holding boat owner had no duty to warn social guest that water was too shallow for diving because guest was not vulnerable and had the ability to protect himself).

A special relationship may arise when one individual's safety has in some way been entrusted to another and that the other has accepted that entrustment. *Erickson v. Curtis Inv. Co.,* 447 N.W.2d 165, 168 (Minn.1989); *cf. Whittemore,* 552 N.W.2d at 708–09 (concluding that the manager of a trailer park did not have a special relationship with children who were abused by another resident of the trailer park because the manager rejected the children's entrustment and told them to notify their parents); *Gilbertson,* 599 N.W.2d at 131–32 (holding homeowners did not have a special relationship with a guest because they did not have custody and control of the guest, the guest had not entrusted her safety to her hosts, and her hosts had not accepted any entrustment). "A special relationship may also arise where one accepts responsibility to protect another, although there was no initial duty." *Lundman v. McKown,* 530 N.W.2d 807, 820 (Minn.App.1995), *review denied* (Minn. May 31, 1995). In *Lundman,* the supreme court concluded a special relationship existed between a diabetic boy and two individuals—a Christian Science nurse and a Christian Science practitioner—whom his mother had hired, paid, and entrusted to provide care to him by praying during his illness. *Id.* at 821–23.

The supreme court has observed that "small children in a licensed day care facility are a particular protected class . . . consists of uniquely vulnerable persons: small children, often infants, left by their working parents in a home other than their own, and left in the care of another person for some period of less than 24 hours of the day." *Andrade v. Ellefson,* 391 N.W.2d 836, 842 (Minn.1986). Here, Flohaug concedes that Hannah was vulnerable and lacked the ability to protect herself. With respect to the existence of a special relationship, the issue before us is therefore whether, in offering to "help" her mother in the day care during the variance period beginning August 21, Flohaug accepted the entrustment of the care and custody of the entire group of dependent children, including Hannah.

The district court concluded, and Flohaug now argues, that no special relationship existed because Flohaug never cared for, met, or saw Hannah in life and was not present in Jeffrey's home when Jeffrey put Hannah down for her nap. Because we believe that Flohaug accepted the en-

trustment of every child in the day care and subsequently acted in a manner consistent with that acceptance, we hold that Flohaug assumed a duty of care toward Hannah.

First, the record is clear that Flohaug specifically promised her mother that she would help in the day care during the variance period without indicating that her assistance would be restricted to specific children. The record is also clear that Jeffrey placed no limitation on Flohaug's function when she identified her to the county on the variance application as a "helper." There is no evidence—and Flohaug does not assert—that Flohaug only agreed to care for certain children or rejected the entrustment of any child or children. *See Whittemore*, 552 N.W.2d at 708–09 (stating no duty arises where entrustment is rejected). We therefore disagree both with Flohaug's assertion that her presence in the home on August 21 was coincidental or not due to her general acceptance of entrustment and with her contention that the only connection between herself and Hannah was that "Flohaug happened to be at home when Hannah passed away."

Flohaug argues that she owed Hannah no duty because "neither Laska nor Jeffrey entrusted [her] with Hannah's care." But the supreme court has specifically adopted that part of § 324A of the Restatement (Second) of Torts (1965) (Liability to Third Person for Negligent Performance of Undertaking), which "imposes liability on a defendant who undertakes for another (whether gratuitously or for consideration) to perform a duty owed by the other to a third person." *Erickson*, 447 N.W.2d at 170. It is undisputed that Jeffrey owed a duty of care to every child present in her home on August 21. Pursuant to § 324A and *Erickson*, when Flohaug agreed to help her mother during the variance period she undertook a duty of care equal in scope to that owed by her mother, that is, a duty to every child, including Hannah. We therefore disagree with Flohaug's argument that her duty to Hannah required a particularized entrustment to her by either her mother or Laska.

Flohaug next argues that, even assuming she did agree to help her mother, she had no duty of care toward Hannah because there was no particularized interaction or contact between herself and the child, contending that "there is absolutely no evidence that [she] ever helped Jeffrey with Hannah's care [and Laska's] inability to establish this link . . . is a fundamental flaw in her liability case against Flohaug." We disagree. It is true that an affirmative rejection of entrustment prevents a duty of care from arising as to specific individuals. *See Whittemore*, 552 N.W.2d at 708–09. But Flohaug's argument that affirmative interaction is required—in addition to a general acceptance of entrustment as to the day care—to trigger a special relationship between herself and Hannah is without legal support.

In *Erickson*, the supreme court rejected an analogous attempt to limit liability, holding that where a security firm contracted with a hotel to patrol a parking ramp adjacent to the hotel, the firm owed a duty of care to every person using the ramp, and could not distinguish between hotel patrons and other ramp patrons for the purposes of determining its liability. 447 N.W.2d at 170–71. Similarly, we are not convinced by Flohaug's assertion that despite her general acceptance of control over a vulnerable group of children, a special relationship only arose between herself and those children with whom she individually interacted.

Flohaug testified that when she agreed to help her mother supervise the children

during the variance period, she understood her tasks to generally include feeding the children, changing diapers, playing with the children, and accompanying them on outings. On the day of Hannah's death, Flohaug performed various tasks, including administering first aid to the toddler who cut her head. The record is clear she did not withhold care from any particular child or refuse to perform any necessary task as to any children. Because Flohaug voluntarily accepted the custody and control of a group of vulnerable individuals—including Hannah—we conclude that Flohaug did have a special relationship with Hannah.

Laska also challenges the district court's conclusion that she failed to establish the second criterion for the existence of a legal duty: the foreseeability of the risk involved. *See Gilbertson,* 599 N.W.2d at 130. In determining whether a danger of injury is foreseeable, courts must consider whether it is objectively reasonable to expect that the specific danger will result in injury, not simply whether it was within the realm of any conceivable possibility. *Whiteford by Whiteford v. Yamaha Motor Corp., U.S.A.,* 582 N.W.2d 916, 918 (Minn.1998). "When the issue of foreseeability is clear, the courts, as a matter of law, should decide it. In close cases, the question of foreseeability is for the jury." *Id.* (footnote omitted).

The district court determined there was no evidence that Flohaug foresaw the risk of an infant being on an adult bed prior to discovering Hannah. The parties present opposing and meritorious arguments concerning whether a foreseeable risk to Hannah was objectively reasonable. Because we cannot conclude the issue of foreseeability is so clear as to be susceptible to resolution as a matter of law, we hold this issue must be resolved by a finder of fact.

Finally, Laska argues summary judgment was improper because a dispute of material fact exists concerning whether Flohaug stated to the police investigating Hannah's death that she entered the room where Hannah was sleeping at some time between 3:30 and 4:00 to check on her. We agree. According to both the police report and the coroner's report, Flohaug did make this statement. At her deposition, Flohaug denied having made the statement, but acknowledged that she spoke with the police when they arrived at the house. Whether Flohaug made the statement and whether the statement is admissible present questions of material fact. A material fact is one that will affect the outcome or result of a case. *O'Malley v. Ulland Bros.,* 549 N.W.2d 889, 890 (Minn.1996).

Here, Flohaug's statement can affect the issue of her liability—and thereby the outcome of the case—because by entering the room during Hannah's nap, Flohaug could have created a special relationship with the child even without having previously accepted her entrustment. *See Lundman,* 530 N.W.2d at 820 (holding "[a] special relationship may ... arise where one accepts responsibility to protect another, although there was no initial duty"); *Walsh v. Pagra Air Taxi, Inc.,* 282 N.W.2d 567, 570 (Minn.1979) (finding special duty where city, while having no affirmative duty to assist in preservation of private property, voluntarily undertook to render fire protection services to airport users). The weight and credit to be accorded conflicting evidence concerning the statement's existence must be determined by a finder of fact. *See Tsudek v. Target Stores, Inc.,* 414 N.W.2d 466, 469 (Minn. App.1987) (stating it is within province of jury to weigh conflicting testimony and determine witness credibility), *review denied* (Minn. Dec. 18, 1987). The district court erred in granting summary judg-

ment in light of this disputed issue of material fact.

## DECISION

By agreeing to help her mother during the day care's permit-variance period, Flohaug accepted the entrustment of every child who was then in her mother's custody and control, including Hannah. On this record, the issue of foreseeability of harm to Hannah is not so clear as to be resolved as a matter of law. The district court therefore erred by granting Flohaug summary judgment based upon its conclusion she owed Hannah no duty as a matter of law. Summary judgment is also precluded here by the disputed issue of material fact concerning Flohaug's statement as reported in the police and coroner's reports. We reverse the grant of summary judgment for Flohaug and remand for trial.

**Reversed and remanded.**