*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-2039**

Amanda Joe Carlson Senogles, as parent and guardian
of Shungmanitou Washtay Kihega, a minor,
Appellant,

vs.

Peter Carlson,
Respondent.

**Filed July 11, 2016
Affirmed
Smith, John, Judge\***

Morrison County District Court
File No. 49-CV-14-1047

David M. Langevin, Mark J. Brandenburger, McSweeney/Langevin, LLC, Minneapolis,
Minnesota (for appellant)

Kevin F. Gray, Matthew W. Moehrle, Rajkowski Hansmeier, Ltd., St. Cloud, Minnesota
(for respondent)

Considered and decided by Ross, Presiding Judge; Stauber, Judge; and Smith, John,

Judge.

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**SMITH, JOHN**, Judge

We affirm the district court's grant of summary judgment to respondent because respondent owed no duty of care, either as a landowner or due to a special relationship, to his great-nephew who drowned in a river adjacent to respondent's property during a family birthday celebration.

## FACTS

On August 24, 2013, respondent Peter Carlson hosted a birthday party for his mother at his home on the Mississippi River in Little Falls. At least 23 family members attended the birthday party. One attendee was Lorrie Lorber, who is Carlson's sister. Lorber is the mother of appellant Amanda Joe Carlson Senogles. Senogles has two children, Shungmanitou Washtay Kihega, known as Shawn, and Manitou, known as Bear, ages four and three, respectively, in August 2013. Lorber brought Shawn and Bear to the party because Senogles left the boys in Lorber's care for the weekend. Senogles did not attend the party.

Carlson set up his backyard for the party by readying food, yard games, and a basketball court. Carlson's backyard is partly enclosed by a chain-link fence. To the side of the fenced-in area, between the house of Carlson and his neighbor, is a basketball court. Carlson's property extends approximately 100 feet beyond the fence to the river and the property has between 76 and 100 feet of shoreline. The Mississippi River is approximately 110 yards wide as it flows by the home. In August 2013, the river was shallow; the water was approximately two feet deep for the first 20 feet from shore.

The majority of guests arrived at Carlson's home at approximately 2:00 p.m. Shortly thereafter, several children, including Shawn and Bear, requested to go swimming in the river. Kassandra Rasmussen, Senogles's sister, enlisted the help of other adults, including Carlson, to help her watch the children. Approximately six adults and between seven and ten children went into the river. Carlson removed Bear from the river when Bear would not stop throwing rocks. Some time later, all the adults and children, including Shawn, left the river to begin eating. While guests ate, Carlson cooked, mingled, and cleaned up. After the meal, children began playing yard games, which were set up approximately 40 feet from the river, or playing on the basketball court, which was approximately 100 feet from the river. At least two people saw Shawn playing on the basketball court.

Shortly after arriving at the party, Lorber experienced a medical issue and intended to leave to seek medical treatment. Not wanting to break up the party, Lorber stayed, socialized, and gave a family member a haircut. Ultimately, however, Lorber decided to leave for the hospital. As she prepared to leave, someone asked about Shawn's whereabouts. A search for Shawn began. Shawn was found minutes later face down and unresponsive in the river. Family members were able to resuscitate Shawn, but Shawn suffered a severe brain injury.[1]

In March 2014, Senogles brought a negligence action against Carlson, alleging that Carlson owed a duty of care to Shawn and that Carlson breached that duty by failing to

---

[1] Shawn has severe brain damage. He requires 24-hour nursing care and the assistance of a ventilator and a feeding machine.

supervise Shawn. Carlson opposed the negligence claim, arguing that Shawn's injuries were caused by the negligence of third parties and that he owed no duty of care to Shawn. Carlson moved for summary judgment against Senogles. Senogles then opposed summary judgment, arguing that Carlson owed Shawn a duty of care based on his status as a landowner and based on a special relationship established when he agreed to supervise Shawn. Following a hearing, the district court granted summary judgment to Carlson, ruling that Carlson "did not owe Shawn a duty to warn him against going into the water unattended or take other precautions against that possibility because . . . it was not objectively reasonable to expect that Shawn would go into the water unattended."

## D E C I S I O N

A district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. This court "review[s] a district court's summary judgment decision de novo. In doing so, we determine whether the district court properly applied the law and whether there are genuine issues of material fact that preclude summary judgment." *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC*, 790 N.W.2d 167, 170 (Minn. 2010) (citation omitted). This court views the evidence "in the light most favorable to the party against whom summary judgment was granted." *Bjerke v. Johnson*, 742 N.W.2d 660, 664 (Minn. 2007) (quotation omitted).

A negligence cause of action consists of four elements: "(1) existence of a duty of care; (2) breach of that duty; (3) proximate causation; and (4) injury." *Id.* "The existence

4

of a duty of care is a threshold question because a defendant cannot breach a nonexistent duty." *Doe 169 v. Brandon*, 845 N.W.2d 174, 177 (Minn. 2014). Generally, whether a duty exists is a legal question, which this court reviews de novo. *Bjerke*, 742 N.W.2d at 664. "Summary judgment is appropriate when the record lacks proof of any of the four elements [of a negligence claim]." *Kellogg v. Finnegan*, 823 N.W.2d 454, 458 (Minn. App. 2012).

## I.

Senogles first argues that Carlson owed a legal duty to Shawn as a landowner because Carlson failed to act reasonably under the circumstances and because a genuine issue of material fact exists as to whether it was foreseeable that Shawn would re-enter the river. Carlson contends that he owed Shawn no duty of care because any danger posed by the river was open and obvious to Shawn.

Minnesota courts have adopted the Restatement (Second) of Torts § 343A (1965), which states:

> A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

*Baber v. Dill*, 531 N.W.2d 493, 495-96 (Minn. 1995) (quoting Restatement (Second) of Torts § 343A). There is a fine line between dangerous activities and conditions that are open and obvious and those that are not. *Id.* at 496.

In *Lee v. State, Dept. of Natural Resources*, a four-and-a-half-year-old boy left to play outside his home, which was located next to a public park that included a fishing lake

5

and pier. 478 N.W.2d 237, 238 (Minn. App. 1991), *review denied* (Minn. Feb. 10, 1992). Approximately seven hours later, the boy was found drowned in the lake. *Id.* The boy was less than four feet tall and could not swim. *Id.* His father brought a negligence action against the state, claiming that the pier was unreasonably dangerous to children because its access was unimpeded and it lacked adequate guardrails. *Id.* at 239. This court affirmed the district court's grant of summary judgment for the state, concluding that the state had no duty to restrict access by installing a gate or making the pier childproof. *Id.* The court reasoned that a gate "would by no means eliminate the obvious danger of the lake itself." *Id.* As such, the court concluded that, regarding an artificial condition such as a pier, "there is no duty for a landowner to prevent dangers that are obvious even to children and that should be recognized by children old enough to be unsupervised." *Id.*

The parties argue the degree to which this court can rely upon *Lee*. Carlson argues that *Lee* demonstrates that a four-and-a-half-year-old child is capable of understanding and appreciating the danger posed by an open body of water. Senogles argues that *Lee* is distinguishable because *Lee* concerned public land and because the child in *Lee* had not previously played in the water. Senogles's attempts to distinguish *Lee* are unpersuasive. First, the distinction between private land and public land is irrelevant when the primary concern is the child's appreciation of the danger of an open body of water. To draw a distinction between private and public land would mean that a plaintiff, particularly a four-and-a-half year old child, is somehow more or less capable of understanding dangers based upon property ownership. We decline to draw such an unreasonable distinction. A four-and-a-half year old can understand and appreciate the danger posed by open water. *See id.*

6

at 239. Second, *Lee* is silent concerning the child's relationship to the neighboring park, pier, and water, and did not address whether the child previously had visited the lake. *See id.* at 238-40. *Lee* thus compels this court to conclude that Carlson is not liable to Shawn for an open and obvious danger of the river.

We are also persuaded by a Restatement section similar to the section adopted in *Baber*, 531 N.W.2d at 495-96 (adopting Restatement (Second) of Torts § 343A). The Restatement (Second) of Torts § 343B (1965), which is entitled "Child Licensees and Invitees," states:

> In any case where a possessor of land would be subject to liability to a child for physical harm caused by a condition on the land if the child were a trespasser, the possessor is subject to liability if the child is a licensee or an invitee.

It follows that if a landowner would *not* be liable to a trespassing child for physical harm caused by a condition on the land (artificial or natural), the landowner is *not* subject to liability if the child is a licensee or invitee. *See Lee*, 478 N.W.2d at 239. In *Lee*, the landowner was not liable to a trespassing child for physical harm caused by an artificial condition on the land. *Id.* at 239. Thus, under the Restatement, Carlson would not be subject to liability because Shawn was an invitee. *See* Restatement (Second) of Torts § 343B.

We conclude that Carlson did not owe a duty to Shawn to protect him from the danger of the river because the danger of the river was open and obvious to Shawn. We therefore need not determine whether it was foreseeable that Shawn would re-enter the

7

river. Accordingly, the district court properly granted summary judgment to Carlson on the issue of landowner duty.

## II.

Senogles next argues that Carlson owed a duty to Shawn to protect him from harm due to a special relationship. She contends that a special relationship was created because Carlson had custody of Shawn and because he assumed responsibility for supervising Shawn.

There is no general duty for an individual to protect another from harm. *Bjerke*, 742 N.W.2d at 665. A duty to protect exists, however, "if (1) there is a special relationship between the parties; and (2) the risk is foreseeable." *Id.* A duty based on a special-relationship theory is distinct from a duty based on a theory of premises liability. *Louis v. Louis*, 636 N.W.2d 314, 320 (Minn. 2001).

### A. Custody Theory

A special relationship between two parties may exist "when an individual, whether voluntarily or as required by law, has custody of another person under circumstances in which that other person is deprived of normal opportunities of self-protection." *Bjerke*, 742 N.W.2d at 665 (quotation omitted). "'Typically, the plaintiff is in some respect particularly vulnerable and dependent on the defendant, who in turn holds considerable power over the plaintiff's welfare.'" *Laska v. Anoka Cty.*, 696 N.W.2d 133, 138 (Minn. App. 2005) (quoting *Donaldson v. Young Women's Christian Ass'n of Duluth*, 539 N.W.2d 789, 792 (Minn. 1995)), *review denied* (Minn. Aug. 16, 2005).

8

Senogles first argues that Carlson had custody of Shawn through a series of transfers of responsibility. She contends the following facts demonstrate that Carlson accepted custody of Shawn: Senogles transferred custody to Lorber when Lorber took Shawn and Bear for the weekend. Lorber informed other adults, including Carlson, that she needed help watching the children. Rasmussen, at the direction of Lorber, asked Carlson to watch the "little ones," including Shawn and Bear. Finally, Carlson assumed custody by "promptly" going to help.

A careful review of the deposition testimony indicates that there is no genuine issue of material fact as to whether Carlson had custody of Shawn. Lorber assumed responsibility for Shawn when she took custody of him for the weekend and that she never left the party or transferred custody of Shawn in anticipation of leaving the party, for several reasons. The testimony demonstrates that this fact is undisputed in several ways. First, there is no evidence that Lorber asked Carlson in particular to watch Shawn. Although Lorber testified that she asked "everybody" to keep an eye out when she planned to go to the hospital, Lorber could not recall if Carlson was present to hear that comment. Two other witnesses also testified that they did not hear Lorber ask Carlson to watch Shawn. In fact, Rasmussen testified that she told Lorber she would watch the boys. Second, there is no evidence that Rasmussen directly asked Carlson to watch Shawn. Rasmussen testified that she asked Carlson to help supervise "the little ones" and that, *in her opinion*, "the little ones" included Shawn and Bear. However, she also testified that she could not recall mentioning Shawn by name, could not recall any specific conversations down by the water about who was watching whom, and could not recall for certain whether

9

Carlson interacted with Shawn in the water. Carlson's testimony is not inconsistent with respect to Shawn. Carlson testified that Rasmussen specifically asked him to watch Bear and that he only went down to the water with Bear. The parties' collective testimony demonstrates that Carlson never had custody of Shawn.

Senogles next argues that a special relationship existed between Carlson and Shawn under a custody theory because "every adult was generally responsible for every child at the party." Senogles's argument is unpersuasive because there is no evidence that Carlson "accepted entrustment of some level of care" for Shawn or "had a large degree of control" over Shawn's welfare. *See Bjerke*, 742 N.W.2d at 665 (concluding that woman owed duty based on special relationship with a teenage girl where the woman invited the girl to live at her home away from her parents and set rules for the girl's conduct); *see also Laska*, 696 N.W.2d at 139 (concluding that woman who promised to "help" her mother run a day care owed all the children in the day care a duty based on special relationship).

There is nothing in the summary-judgment record to indicate that Carlson had custody of Shawn. Senogles's attempts to infer that such a relationship existed fail because "[a] party cannot rely upon speculation to demonstrate the existence of a genuine fact issue" and "a party opposing summary judgment must do more than show that there is a metaphysical doubt as to material facts." *Johnson v. Van Blaricom*, 480 N.W.2d 138, 140-41 (Minn. App. 1992) (citing *Fownes v. Hubbard Broad., Inc.*, 302 Minn. 471, 474, 225 N.W.2d 534, 536 (1975)). Accordingly, Carlson is entitled to summary judgment with respect to Senogles's claim that he owed Shawn a duty of care based on a special relationship due to custody.

10

**B.     Assumption of Responsibility Theory**

A special relationship between two parties may also exist "when an individual assumes responsibility for a duty that is owed by another individual to a third party." *Bjerke*, 742 N.W.2d at 665.

Senogles's contentions with respect to this theory are similar to her contentions noted above. She argues that there is a genuine issue of material fact about who assumed responsibility for Shawn because there are conflicting accounts of who assumed responsibility for Shawn. Senogles mischaracterizes the record. There are no conflicting accounts as to whether anyone specifically asked Carlson to watch Shawn or as to whether Carlson agreed to watch Shawn. Five of the six deposed witnesses could not identify a particular person charged with watching Shawn and each of those five witnesses stated that there was no general discussion about who would watch the children. Two of the six witnesses, including Rasmussen, each stated that she told Lorber she would help to supervise Shawn. There is no evidence in the record to indicate that Lorber transferred the responsibility of supervising Shawn to Carlson. Accordingly, Carlson is also entitled to summary judgment with respect to Senogles's claim that he owed Shawn a duty of care based on a special relationship due to assumption of responsibility.

We cannot conclude that Carlson owed Shawn a legal duty to protect Shawn from the danger of the river based on his status as a landowner or due to a special relationship. Therefore, the district court did not err by granting summary judgment to Carlson.

**Affirmed.**

11